IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI

**RENASANT BANK,**

    **Plaintiff,**

vs.   Case No. 1:15CV90-SA-DAS

**ST. PAUL MERCURY**
**INSURANCE COMPANY**

    **Defendant.**

## COMPLAINT

Plaintiff, Renasant Bank, files its Complaint against St. Paul Mercury Insurance Company, and states:

### I. PARTIES

1.  Plaintiff, Renasant Bank ("Renasant") is a state chartered bank with its principal place of business in Tupelo, Mississippi.

2.  Defendant, St. Paul Mercury Insurance Company ("St. Paul") is an insurance company organized and existing under the laws of the State of Minnesota with its principal place of business in St. Paul, Minnesota. St. Paul is authorized to and is conducting business in the State of Mississippi. St. Paul may be served through its registered agent for service of process, United States Corporation Company, 506 South President Street, Jackson, Mississippi 39201.

## II. JURISDICTION AND VENUE

3. Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

4. Venue is proper in this Court pursuant to 28 U.S.C. §1391.

## III. FACTS

**The Bond**

5. At all times relevant herein, St. Paul was actively engaged in, among other things, the business of writing insurance in general, and in particular, insurance policies known as "Financial Institution Bonds."

6. On September 9, 2008, St. Paul issued to Renasant Corporation, the holding company for Renasant, a Financial Institution Bond bearing policy number 468PB1324 ("the Bond"), with an effective date of September 6, 2008. (A true and correct copy of the Bond is attached hereto as Exhibit A and incorporated herein by reference).

7. On September 11, 2008, an endorsement/rider was issued by St. Paul making Renasant a named insured under the Bond.

8. Pursuant to Insuring Clause (A) of the Bond, St. Paul agreed to pay Renasant for: "Loss resulting directly from: . . . Dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others, which acts are committed by the Employee with the intent: (a) to cause the Insured to sustain such a loss; or (b) to obtain financial benefit for the Employee or another person or entity."

9. Pursuant to Insuring Clause (A), if some or all of the "Insured's loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee: (i) acted with

the intent to cause the Insured to sustain such a loss; (ii) was in collusion with one or more parties to the transaction; and (iii) has received, in connection therewith, an improper financial benefit."

10. Insuring Clause (A) further provides: "in the case of loss resulting from…Loans…where such Employee fails to receive an improper financial benefit, such loss nevertheless will be covered hereunder as if the Employee had received such benefit if: (i) other persons with whom the Employee was dishonestly or fraudulently acting in collusion received proceeds from the Loan…and (b) the Insured establishes that the Employee intended to share or participate in the proceeds of the Loan…"

11. "Employee" is defined in the Bond as, among other things, "an officer or other employee of the Insured, while employed at, or by any of the Insured's office or premises covered hereunder…"

12. "Loan" is defined in the Bond as "all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship."

### Notice and Proof of Loss to St. Paul and St. Paul's Denial of Claim

13. On July 24, 2009, in accordance with the terms of the Bond, Renasant provided timely notice to St. Paul regarding two potential losses covered by the Bond arising from the dishonest or fraudulent activities of a former Vice-President of Construction Lending, Wendy Hurt ("Hurt"), in the approval, extension, administration and funding of two loan transactions with Renasant customers H.B.O. Holdings, LLC ("HBO"), Hackmeyer/Hyneman/Bourne, LLC ("HHB"), and/or their common principals, William R. Hyneman ("Hyneman") and Michael Bourne ("Bourne") (collectively the "Loans").

14. The Loans were commercial real estate loans intended to provide a line of credit for the acquisition and development of two properties. The Loans were underwritten, submitted, closed, and funded by Hurt.

15. Hurt, as Vice-President of Construction Lending, is an "Employee" under the Bond.

16. St. Paul acknowledged receipt of Renasant's notice on July 28, 2009, and provided Renasant with a blank Proof of Loss form.

17. On May 19, 2011, in accordance with the terms of the Bond and mutual agreements for extensions with St. Paul, Renasant submitted to St. Paul its sworn Proof of Loss substantiating its principal losses on the Loans in the total amount of $7,773,294.20. (A true and correct copy of the sworn Proof of Loss is attached hereto as Exhibit B and incorporated herein by reference.) Along with the sworn Proof of Loss Renasant submitted documentation supporting the losses sustained and the factual bases for the claim.

18. On July 6, 2011, Renasant supplemented its sworn Proof of Loss to provide further support for the losses sustained and factual bases for the claim. (The supplement to the sworn Proof of Loss is attached hereto as Exhibit C.)

19. St. Paul formally acknowledged receipt of the May 19, 2011 Proof of Loss; July 6, 2011 supplement to the Proof of Loss; and subsequent correspondences and updates.

20. Renasant fully cooperated with St. Paul's investigation of Renasant's claim, has supplied all relevant and necessary information to St. Paul, and kept St. Paul updated on the status of Renasant's litigation against Hyneman and Bourne and investigation of the subject loan transactions.

21. On September 28, 2012, St. Paul denied Renasant's claim.

**The Loans**

22. Hurt was a veteran loan officer, having been involved in commercial and construction lending since 1990 and having joined Renasant in March of 1999. Hurt was responsible for ensuring the Loans were properly underwritten in accordance with the policies and procedures of Renasant and the commercial/construction lending industry, submitted to and approved by the Renasant Board Loan Committee ("Committee"), closed on the terms and conditions of the Committee's approval, and funded only on the approved terms and conditions and in accordance with the policies and procedures of Renasant.

23. Although Bourne did not have any relationship with Hurt or Renasant prior to the Loans, Hurt had a significant, 16 year banking and lending relationship with Hyneman.

24. Hyneman was a well-known real estate developer/investor at the time of the Loans and is now notorious for colluding to manipulate lending transactions in order to receive substantial profits on the front end instead of in the normal course and during the life of development projects. In fact, Hyneman taught Bourne how to manipulate lending transactions to receive substantial profit on the front end.

25. Bourne brought the Loans directly to Hurt, not Renasant, at the direction of Hyneman. Both Hurt and Hyneman knew that Bourne was not an experienced developer and that Hurt could not obtain approval for the Loans without an experienced developer like Hyneman.

26. Hurt informed Bourne that he would need to work with an experienced developer in order to get the Loans approved. At the time Hurt informed Bourne of this condition, she was working in concert with Hyneman and with the knowledge that Bourne would partner with Hyneman on the projects, ultimately resulting in financial gain for both Hyneman and Bourne and in improper financial benefit and/or intended improper financial benefit for Hurt.

5

27. Hyneman and Bourne, individually and as partners, have an established pattern and practice of obtaining favorable financial benefits and services from others in return for gifts, entertainment, travel, and goods and services. Based on information and belief, Hurt has on occasion accepted improper financial benefits from Hyneman and/or Bourne in the form of gifts, entertainment, travel, and/or goods and services, all with the expressed or implied understanding that Hurt would in return facilitate and administer extensions of credit for Hyneman related projects that would ensure front end profit for Hyneman and Bourne and continued business and improper financial benefits for Hurt.

28. Hurt exploited her relationship with Hyneman to the detriment of Renasant on the Loans, while personally profiting or intending to profit from the transactions. When her actions in connection with the Loans were exposed, she left the employment of Renasant and accepted employment with another financial institution where she continued to extend credit to Hyneman despite knowing Hyneman's fraudulent dealings and Renasant's losses on the Loans in question.

**Piperton Square Loan**

29. At the request of Hyneman, Bourne contacted Hurt to request a $6,700,000 loan for the acquisition and development of a 91.71 acre tract consisting of 74.79 residential acres and 16.92 commercial acres. The development, located in Fayette County, Tennessee, was to be known as Piperton Square.

30. Hyneman and Bourne were partners in the planned Piperton Square development and formed H.B.O. Holdings, LLC ("HBO") on October 17, 2006, for the sole purpose of acquiring and developing the Piperton Square property into, among other things, 284 residential lots.

31. At the time of the loan request an entity owned by Bourne, Bourne Holdings, LLC ("Bourne Holdings"), had a contract to purchase the 74.79 residential acres for $1,813,658 and a contract to purchase the 16.92 commercial acres for $1,481,346.

32. Pursuant to the loan request, Bourne and Hyneman proposed that they, through an entity to be formed at a later date (HBO), use $3,600,000 of the $6,700,000 loan proceeds to purchase the 91.71 acre tract which they would pledge as collateral for loan, knowing that they could pocket the money over and above the Bourne Holdings contract price as a quick "profit."

33. The Renasant Loan Policy ("Loan Policy") required that the land and proposed development be appraised. Renasant also prohibited using the loan proceeds to fund more than the appraised value of the land for its purchase.

34. Hurt obtained an appraisal dated September 19, 2006, which valued the entire undeveloped 91.71 acres at $2,570,000 with the 16.92 commercial acres accounting for $1,330,000 of the appraised value. This appraisal also contained detailed construction costs for the development of the Piperton Square property.

35. With this appraisal in hand, Hurt, Bourne and Hyneman knew that only $2,570,000 of the loan proceeds could be used to purchase the 91.71 acres for the Piperton Square development.

36. On October 17, 2006, Hurt permitted the $6,700,000 Piperton Square development loan to HBO to close. At the closing, Hurt permitted the distribution of $2,570,000 of the loan proceeds as the "contract sales price" for the land. However, Hurt knew that instead of the entire 91.71 acres being purchased for the $2,570,000, in fact only the 74.79 residential acres were purchased by HBO and Renasant only received the 74.79 acre residential tract as collateral.

37. Although Hurt represented to the Committee that the loan would be collateralized by the entire 91.71 acres, Hurt knew that Renasant would not receive the 16.92 acre commercial tract

as collateral. Hurt, acting dishonestly and with the intent to cause Renasant loss, intentionally failed to disclose this information to the Committee in order to ensure approval of the loan. Had Hurt disclosed to the Committee the true facts regarding the collateral, the Committee would not have approved this loan.

38. Thus, Hurt authorized the loan to HBO at its full, originally proposed amount of $6,700,000 despite knowing that Renasant would not receive as collateral the 16.92 acres of the more valuable commercial acreage appraised at $1,330,000. In addition, Hurt knew that a significant portion of the 284 residential lots were to be developed on the commercial acreage thereby causing further harm to Renasant when the commercial acreage was not included as part of the collateral.

39. As Hurt further knew, on the day the Piperton loan closed, the 74.79 acre residential tract was purchased by Bourne Holdings for $1,876,385. Contemporaneously, Bourne Holdings sold the 74.79 acres to HBO for $2,570,000. This immediate "flip" of the property from one Bourne entity to another resulted in an immediate "profit" of $693,615, which was immediately divided between Bourne and Hyneman. Hurt, acting dishonestly and with the intent to cause Renasant loss, intentionally failed to disclose this information to the Committee in order to ensure approval of the loan. Had Hurt disclosed to the Committee the true facts regarding the collateral, the Committee would not have approved this loan.

40. The Loan Policy also required Hurt to determine that the Piperton Square project was viable and to obtain the information on completing the project, including a cost breakdown on the project. The Loan Policy specifically directed Hurt to "watch for developer fees and other soft costs that may flow back into the developer's pocket."

41. In violation of the Loan Policy and her duties as a loan officer, shortly before closing, Hurt dishonestly approved a $1,030,000 disbursement from the loan proceeds to HBO for a "partnership buyout." Hurt knew that this $1,030,000 disbursement was not within the approved purpose of the loan and further knew that these additional funds were being paid to Bourne and Hyneman and that there was no "partnership" to be bought out.

42. As Hurt knew, the appraised value for the entire 91.71 acres was $2,570,000, thus limiting the amount which could be disbursed from the loan to purchase the land. An additional $1,030,000 added to the $2,570,000 would equate to the $3,600,000 which Bourne and Hyneman originally proposed as the purchase price for the 91.71 acre tract. The $1,030,000 disbursement for the "partnership buyout," did not benefit or add value to the underlying loan and development, but instead simply depleted funds that would otherwise have been available for the development of the property.

43. Hurt knew, the $1,030,000 "partnership buyout" was a fraudulent device to funnel money to Bourne and Hyneman at closing, and knew it was devised as a means for Hyneman and Bourne to make up for the "profit" that was going to be "lost" in the Piperton Square transaction due to the reduction of the purchase price based upon the less than favorable appraisal. Hurt, acting dishonestly and with the intent to cause Renasant loss, intentionally failed to disclose to her superiors or the Committee that more than 15% of the loan proceeds were not being used for the Piperton Square project, but instead were being funneled directly to Bourne and Hyneman. Had Hurt disclosed to the Committee the true facts regarding the use of the loan proceeds, the Committee would not have approved this loan.

44. As a result, Hurt dishonestly and fraudulently and with the intent to cause Renasant to sustain a loss, permitted over $4,736,000 (71%) of the loan proceeds to be distributed to Bourne

and Hyneman at closing while only securing as collateral 74.79 acres of the subject property as collateral.

45. Following the closing, Hurt intentionally failed to take any action to cause HBO to obtain the commercial acreage of the Piperton Square development and provide it as additional collateral for the Renasant loan as originally contemplated. In fact, HBO received a separate loan from another lender, First Security Bank, pledging the commercial acreage as collateral thereby preventing Renasant from acquiring a first mortgage on the commercial acreage.

46. Hurt knew the Piperton Square loan was under collateralized and violated the Loan Policy. Hurt, acting in concert with Hyneman and Bourne, committed dishonest and/or fraudulent acts to hide these facts from the Committee and her superiors at Renasant to ensure Hyneman and Bourne profited from this transaction at the expense of Renasant.

47. In addition to the foregoing, and in further violation of the Loan Policy, Hurt, Hyneman, and Bourne took additional dishonest actions to ensure substantial profit would flow to Hyneman and Bourne at the intended expense of Renasant.

48. On or before the closing, Hurt was informed by the closing attorney that another of Bourne's entities, Aquatech Systems of TN, LLC ("Aquatech"), had purportedly performed sewer design and engineering services on behalf of Bourne Holdings for the 284 residential lots in Piperton Square and that Bourne was seeking a further $1,136,000 disbursement from the loan proceeds as reimbursement of these alleged expenses. The closing attorney further informed Hurt that she had only recently formed Aquatech for Bourne. Moreover, these design and engineering services had purportedly been done before July 6, 2006, over three months before either Bourne Holdings or HBO purchased the property that was to become Piperton Square. Thus, Hurt knew that these services were totally fictitious and were never undertaken.

49. Hurt had only three documents produced by Bourne to support this further payment from the loan proceeds: (1) an invoice dated July 6, 2006 in the amount of $1,136,000 billed to Bourne Holdings at Bourne's home address; (2) a copy of the front of a purported check dated July 24, 2006 from B&B Holdings, Inc. ("B&B"), another Bourne entity, to Aquatech in the amount of $1,136,000 signed by Bourne with a notation for "Piperton Square sewer design fees;" and (3) a statement from Aquatech to Bourne Holdings indicating that the check for $1,136,000 had been received on July 24, 2006, leaving a zero balance. There was nothing on the check to indicate the check had actually been presented to B&B's bank. All three documents were fictitious and created for the sole purpose of dishonestly and fraudulently obtaining an additional $1,136,000 from the loan proceeds. In fact, B&B's checking account never had a balance of over $200 at any relevant time.

50. Although Hurt knew that Aquatech was owned by Bourne, that the $1,136,000 would go to Bourne and Hyneman, and that the services were purportedly performed some 3 months before either Bourne or Hyneman had an interest in the Piperton Square property, Hurt nonetheless approved the disbursement of $1,136,000 at closing. If the Aquatech invoice had in fact been paid, then the loan proceeds should have been disbursed to B&B to reimburse this expense. Instead, as Hurt knew, two payments of $568,000 for "sewer and water design fees" were disbursed from the loan proceeds to Hyneman, personally, and to Bourne Holdings. Hurt authorized these payments even though no sewer design services of any kind had ever been performed. Hurt, acting dishonestly and with the intent to cause Renasant loss, intentionally failed to disclose to her superiors or the Committee that another 17% of the loan proceeds - for a total of over 32% - were being funneled directly to Bourne and Hyneman – with no benefit to Renasant or

the development. Had Hurt disclosed to the Committee the true facts regarding the use of the loan proceeds, the Committee would not have approved this loan.

51. On October 19, 2006, the Piperton loan was funded. Hurt fraudulently and dishonestly caused Renasant to advance $4,916,800 of the loan proceeds (73% of the loan) at closing even though Hurt knew the loan did not comply with the Committee's approval terms, was in violation of the Loan Policy, and that the development did not have the approval of the town of Piperton which was necessary because the project required a large septic tank system. Of the $4,916,800 advanced at closing, Bourne Holdings was, in essence, paid $3,600,000 for the 74.79 acres for which it had paid $1,876,385 two days earlier resulting in an immediate profit of $1,723,615.

52. Hurt knew that this unconscionable advance of nearly $5 million on the front end of the transaction would not leave adequate funds to develop the lots. Therefore, not only did Hurt cause Renasant to pay Bourne and Hyneman $2,860,000 unearned "profit" on the front end of the transaction while acquiring less collateral than approved; she also derailed the future development of the project and repayment source of the loan.

53. On October 19, 2006, Bourne paid Hyneman $861,807.80 representing one-half of the "profit" made on the sale of the 74.79 acres by Bourne Holdings.

54. At closing, Bourne and Hyneman each received $1,430,000 from the Piperton Square loan proceeds despite no work having been performed on the project.

55. On October 18, 2006, Bourne spent over $72,000 on men's and women's jewelry with a check drawn on the account of B&B which documented the purchases on the "memo" line as "deal gifts." Some of these "deal gifts" were provided to Hurt for her dishonest or fraudulent acts in

causing Renasant to fund the Piperton loan and providing $1.43 million to both Bourne and Hyneman at the expense of Renasant.

56. Hurt committed these dishonest or fraudulent acts with the intent to cause a loss to Renasant while acting in collusion with Hyneman and Bourne to funnel $2.86 million of the loan proceeds to Hyneman and Bourne. Hurt in turn received an improper financial benefit in connection with this loan and/or intended to participate or share in the proceeds of the loan.

57. The resulting loss to Renasant due to the dishonest or fraudulent acts of Hurt in connection with the Piperton Square loan is $4,467,984.77.

**The Villages Loan**

58. Simultaneously with the Piperton Square loan, Bourne and Hyneman approached Hurt about another acquisition and development loan to HHB which loan was obtained from Renasant through the dishonest, fraudulent and deceptive actions of Hurt, Hyneman and Bourne similar to those used to obtain the Piperton Square loan.

59. The HHB loan was originally proposed as an $8,000,000 loan for the acquisition and development of 153.27 acres of mixed-use (residential and commercial) property (the "Villages Tract"), with Renasant taking the entire 153.27 acres as collateral. The proposed purchase price for the land was $3,800,000.

60. The Villages Tract was intended to include 140.47 acres of residential property and 12.8 acres of commercial property. A September 25, 2006 appraisal valued the entire 153.27 acres of mixed-use land for $3,680,000 which included the 12.8 commercial acres valued at $960,000. As with the Piperton Square tract, the Villages commercial tract was more valuable per acre than its residential counterpart.

61. Prior to the purchase of the Villages Tract by HHB, the several properties which comprised the Villages Tract had been acquired throughout 2006 by B&B and F. William Hackmeyer ("Hackmeyer") in four separate transactions including two transactions between the members of HHB: B&B acquired property from Hackmeyer on February 28, 2006 and from Monterrey Road Partnership (a Hyneman entity) on May 5, 2006. Of these properties, 140.47 residential acres were then collectively sold by B&B "d/b/a Bourne Holdings" and Hackmeyer to HHB at the closing. Once again, Bourne entities were on both sides of the transaction; in fact Bourne signed the purchase agreement on behalf of both Bourne Holdings and HHB.

62. On October 10, 2006, Hurt permitted the Villages development loan to close. In violation of Renasant's policy that no more than the appraised value be disbursed for the purchase of the land, at the closing Hurt permitted $3,800,000 of the loan proceeds to be disbursed to purchase the entire 153.27 acres; however Hurt only obtained the 140.47 acre residential tract as collateral.

63. Although Hurt represented to the Committee that the loan would be collateralized by the entire 153.27 acres, Hurt knew that Renasant would not receive the 12.8 acre commercial tract as collateral. Hurt, acting dishonestly and with the intent to cause Renasant loss, intentionally failed to disclose this information to the Committee in order to ensure approval of the loan. Had Hurt disclosed to the Committee the true facts regarding the collateral, the Committee would not have approved this loan.

64. Thus, in contravention of the terms of the Committee approval, and as Hurt had done with the Piperton Square loan, Hurt dishonestly and fraudulently and with the intent to cause Renasant to sustain a loss authorized the loan to HHB at its full, originally proposed amount of

$8,000,000 despite knowing that Renasant would not receive as collateral the 12.8 acres of the more valuable commercial acreage appraised at $960,000.

65. In furtherance of the dishonest scheme, and to the detriment of Renasant, Hurt also authorized $923,335.95 of the loan proceeds to be paid to Community Bank to pay off a loan that was secured by the 12.8 acre Villages commercial tract, resulting in Bourne Holding's owning the 12.8 acre commercial without encumbrances. Contemporaneously with the closing, Bourne Holding's conveyed a 50% interest in the 12.8 acre commercial tract to Hyneman.

66. Following the closing, Hurt intentionally failed to take any action to cause HHB to obtain the Villages commercial tract and provide it as collateral for the HHB loan. In fact, shortly after the closing, Bourne Holdings and Hyneman conveyed the 12.8 commercial acres to HBO. HBO then obtained a separate loan from Cadence Bank pledging the commercial acreage as collateral, thereby preventing Renasant from acquiring a first mortgage on the commercial acreage.

67. Hurt knew the Villages loan was under collateralized and violated the Loan Policy. Hurt, acting in concert with Hyneman and Bourne, committed dishonest and/or fraudulent acts to hide these facts from the Committee and her superiors at Renasant to ensure Hyneman and Bourne profited from this transaction at the expense of Renasant.

68. In addition to the foregoing, and in further violation of the Loan Policy, Hurt, Hyneman, and Bourne took additional dishonest actions to ensure substantial profit would flow to Hyneman and Bourne at the intended expense of Renasant.

69. Similar to the Piperton Square loan, Hurt authorized the disbursement of $1,384,062 of the loan proceeds to Bourne Holdings and Hyneman purportedly for the reimbursement of expenses, including sewer fees, construction of a development entrance and wall, and associated engineering work with Bourne receiving $825,638 and Hyneman receiving $558,424 at closing.

70. Hurt authorized the $1,384,062 disbursal of the loan proceeds based only on invoices from Bourne Holdings with the stated purpose to "cover money paid by Bourne Holdings . . ." and invoices to Hyneman and Bourne stating that Hyneman and Bourne "paid Wall Fee 50/50." Hurt authorized these payments even though no sewer or engineering work had ever been performed or "Wall Fee" paid. Hurt, acting dishonestly and with the intent to cause Renasant loss, intentionally failed to disclose to her superiors or the Committee that 17% of the loan proceeds were being funneled directly to Bourne and Hyneman. Had Hurt disclosed to the Committee the true facts regarding the use of the loan proceeds, the Committee would not have approved this loan.

71. On or about October 6, 2006, shortly before Villages loan closed, Bourne spent over $37,000 solely on women's jewelry. In addition, following the closing of the Villages loan, on October 18, 2006, Bourne spent over $72,000 on men's and women's jewelry with a check drawn on the account of B&B which documented the purchases on the "memo" line as "deal gifts." Some of these "deal gifts" were provided to Hurt for her dishonest or fraudulent acts in causing Renasant to fund the for her dishonest or fraudulent acts in causing Renasant to fund the Villages loan providing $2.35 million to both Bourne and Hyneman at the expense of Renasant.

72. Hurt committed these dishonest and fraudulent acts with the intent to cause a loss to Renasant while acting in collusion with Hyneman and Bourne to funnel over $2.35 million of the loan proceeds to or for the benefit of Hyneman and Bourne. Hurt in turn received an improper financial benefit in connection with this loan and/or intended to participate or share in the proceeds of the loan.

73. The resulting loss to Renasant due to the dishonest or fraudulent acts of Hurt in connection with the Villages loan is $3,305,309.43.

## COUNT I
## BREACH OF CONTRACT

74. Renasant hereby incorporates Paragraphs 1 through 73 of the Complaint as though fully set forth herein.

75. All of the Bond's requirements for coverage of the loss described herein have been satisfied and fulfilled.

76. The losses sustained by Renasant resulted directly from the dishonest and fraudulent acts of Hurt, a Renasant employee, acting in collusion with Hyneman and Bourne, parties to the transactions, and which acts were committed by the Hurt with the intent to cause Renasant to sustain such losses and for which Hurt received an improper financial benefit and/or intended to participate or share in the proceeds of the Loans.

77. All of the losses set forth in the sworn Proof of Loss are covered by Insuring Agreement (A) of the Bond.

78. St. Paul has breached its contract with Renasant by failing to pay Renasant's claim under the Bond.

79. Renasant has lost principal of $8,346,170, and thus been damaged in this amount plus pre-judgment and post-judgment interest and extra-contractual damages including but not limited to its expenses in preparing the claim, attorneys' fees costs, and other reasonably foreseeable expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Renasant prays for relief as follows:

1. A trial by jury on all issues;

2. Judgment in favor of Renasant and against St. Paul in the amount of $8,346,170;

3. Judgment in favor of Renasant and against St. Paul for pre-judgment and post-judgment interest, extra-contractual damages for Renasant's expenses incurred in preparing the claim, attorneys' fees and costs, and other reasonably foreseeable expenses; and

4. All additional and further relief to which Renasant may be entitled.


Date:  May 15, 2015                             /s/ Patrick M. Ardis
                                                        Patrick M. Ardis, MS Bar #104916
Mary L. Wolff (Pro Hac Vice Pending)
WOLFF ARDIS, P.C.
5810 Shelby Oaks Drive
Memphis, TN 38134
(901)763-3336
(901)763-3376(Fax)
pardis@wolffardis.com
mwolff@wolffardis.com

Stephen W. Vescovo (Pro Hac Vice Pending)
LEWIS THOMASON, PC
40 South Main
Memphis, TN  38103
(901) 525-8721
(901) 525-6722 (Fax)
svescovo@lewisthomason.com