IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

RENASANT BANK                                                    PLAINTIFF

v.                                          CIVIL ACTION NO.: 1:15-cv-00090-GHD-RP

ST. PAUL MERCURY INSURANCE
COMPANY                                                          DEFENDANT

## MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court are the parties' cross-motions for summary judgment: Defendant St. Paul Mercury Insurance Company's motion for summary judgment [192] and Plaintiff Renasant Bank's motion for partial summary judgment [195], as well as Plaintiff Renasant Bank's motion to strike [211] specific argument in Defendant St. Paul Mercury Insurance Company's reply [207] in support of its motion for summary judgment [192]. Upon due consideration, the Court finds that Plaintiff Renasant Bank's motion for partial summary judgment [195] should be granted in part and denied in part, and Defendant St. Paul Mercury Insurance Company's motion for summary judgment [192] should be granted in its entirety. Because the Court does not consider Defendant St. Paul Mercury Insurance Company's reply [207] in its ruling on the motion for summary judgment [192], Plaintiff Renasant Bank's motion to strike [211] is denied as moot.

### I. Factual and Procedural Background

Plaintiff Renasant Bank ("Renasant" or "Renasant Bank") brings this breach-of-contract claim against Defendant St. Paul Mercury Insurance Company ("St. Paul") to recover under a Financial Institution Bond for damages arising out of the alleged dishonest or fraudulent

1

activities of a former bank Vice-President of Construction Lending, Wendy Hurt ("Hurt"). According to Renasant's complaint, Hurt was a veteran loan officer for Renasant, having been involved in commercial and construction lending since 1990 and having joined Renasant in March of 1999. Also according to Renasant's complaint, Hurt approved, extended, administrated, and funded two large commercial real estate loan transactions with Renasant customers H.B.O. Holdings, LLC ("HBO"); Hackmeyer/Hyneman/Bourne, LLC ("HHB"); and/or their common principals, William R. Hyneman ("Hyneman") and Michael Bourne ("Bourne") (collectively, the "Loans").

Renasant alleges that Hurt was responsible for ensuring the Loans were properly underwritten in accordance with Renasant's policies and procedures and the commercial/construction lending industry, submitting the proposed loans to Renasant's loan committee, closing on the terms and conditions of committee approval, and funding the Loans only on the approved terms and conditions and in accordance with Renasant's policies and procedures.

Renasant further alleges, *inter alia*, that Hurt had a significant, sixteen-year banking and lending relationship with Hyneman, who "was a well-known real estate developer/investor at the time of the Loans and is now notorious for colluding to manipulate lending transactions in order to receive substantial profits on the front end instead of in the normal course and during the life of development projects." Pl.'s Compl. [1] ¶¶ 23–24. According to Renasant, Hurt worked in concert with Hyneman and Bourne so that Hyneman and Bourne could receive financial gain and Hurt could receive an improper financial benefit and/or intended improper financial benefit, including "gifts, entertainment, travel, and/or goods and services, all with the expressed or implied understanding that Hurt would in turn facilitate and administer extensions of credit for

2

Hyneman[-]related projects that would ensure front[-]end profit for Hyneman and Bourne and continued business and improper financial benefits for Hurt." *Id.* ¶ 27. Renasant avers that when Hurt's actions in connection with the Loans came to light, Hurt left Renasant's employment and accepted employment with another financial institution, where she continued to extend credit to Hyneman, despite her knowledge of Hyneman's fraudulent dealings and Renasant's losses on the Loans.

Renasant Bank, which is owned by Renasant Corporation, is a Mississippi-chartered bank with its principal place of business in Tupelo. *Id.* ¶ 1; Pl.'s Corp. Disclosure Statement [8] at 1. St. Paul is an insurance company incorporated in Connecticut with its principal place of business in Connecticut; St. Paul is authorized to and is conducting business in Mississippi. Pl.'s Compl. [1] ¶ 2; Def.'s Answer & Aff. Defenses [23] ¶ 2. As part of its business, St. Paul issues Financial Institution Bonds. Pl.'s Compl. [1] ¶ 5; Def.'s Answer & Aff. Defenses [23] ¶ 5. St. Paul issued a Financial Institution Bond, Policy No. 468PB1324 (the "Bond"), to Renasant Corporation with an effective date of September 6, 2008. Pl.'s Compl. [1] ¶ 6; Def.'s Answer & Aff. Defenses [23] ¶ 6; Def.'s Mem. Br. Supp. Mot. Summ. J. [193] at 8; Bond [1-1] at 5. On September 11, 2008, an Endorsement was executed that amended the Insured as stated in the Declarations of the Bond to include Renasant Bank, effective September 6, 2008. Pl.'s Compl. [1] ¶ 7; Def.'s Answer & Aff. Defenses [23] ¶ 7; Bond [1-1] at 34.

In pertinent part, the Bond covers "[l]oss resulting directly from: . . . [d]ishonest or fraudulent acts committed by an Employee acting alone or in collusion with others, which acts are committed by the Employee with the intent: (a) to cause the Insured to sustain such a loss; or (b) to obtain financial benefit for the Employee or another person or entity." Bond [1-1] at 9, Insuring Clause (A). The Bond provides that if the "Insured's loss results directly or indirectly

3

from Loans, that portion of the loss is not covered unless the Employee: (i) acted with the intent to cause the Insured to sustain such a loss; (ii) was in collusion with one or more parties to the transaction; and (iii) has received, in connection therewith, an improper financial benefit." *Id.* The Bond further provides that "in the case of loss resulting from . . . Loans . . . where such Employee fails to receive an improper financial benefit, such loss nevertheless will be covered hereunder as if the Employee had received such benefit if: (i) other persons with whom the Employee was dishonestly or fraudulently acting in collusion received proceeds from the Loan . . . and (ii) the Insured establishes that the Employee intended to share or participate in the proceeds of the Loan . . . ." *Id.* The Bond also provides that "financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing[,] or pensions." *Id.* The Bond defines the term "Loan" as "all extensions of credit by the Insured and all transactions creating a creditor relationship in favor of the Insured and all transactions by which the Insured assumes an existing creditor relationship." *Id.* at 21, Conditions and Limitations, § 1(ff).

After Renasant allegedly suffered the losses in connection with Hurt's Loans, Renasant contacted St. Paul, and indicated that the losses potentially triggered the Bond's coverage. St. Paul acknowledged receipt of Renasant's notice of potential loss on July 28, 2009, and provided Renasant with a blank Proof of Loss form. Pl.'s Compl. [1] ¶ 16; Def.'s Answer & Aff. Defenses [23] ¶ 16. On May 19, 2011, St. Paul received correspondence from Renasant concerning its claim against the Bond and enclosing a notarized Proof of Loss with a Statement of Facts in Support of Proof of Loss. Pl.'s Compl. [1] ¶ 13; Def.'s Answer & Aff. Defenses [23] ¶ 13; Proof of Loss [1-2]. The Proof of Loss provided information concerning Renasant's

alleged losses due to Hurt's alleged dishonesty in connection with the Loans. Proof of Loss [1-2] at 2.

On July 6, 2011, St. Paul received further correspondence from Renasant concerning its claim against the Bond and enclosing a Supplemental Proof of Loss, wherein Renasant provided materials purporting to support its claim. Pl.'s Compl. [1] ¶ 18; Def.'s Answer & Aff. Defenses [23] ¶ 18; Supplemental Proof of Loss [1-3]. Subsequently, Renasant and St. Paul engaged in communication concerning Renasant's claim against the Bond. Pl.'s Compl. [1] ¶¶ 19–20; Def.'s Answer & Aff. Defenses [23] ¶¶ 19–20. On September 28, 2012, St. Paul denied Renasant's claim. Pl.'s Compl. [1] ¶ 21; Def.'s Answer & Aff. Defenses [23] ¶ 21.

On May 15, 2015, Renasant filed this lawsuit against St. Paul, alleging that St. Paul's denial of Renasant's claim for coverage on the Bond constitutes breach of contract. On June 9, 2015, St. Paul filed a motion to dismiss [9] pursuant to Rules 12(b)(6) and 12(e) of the Federal Rules of Civil Procedure. On July 23, 2015, the Court entered an Order [21] and memorandum opinion [22] denying St. Paul's motion to dismiss.[1] On August 5, 2015, St. Paul filed its answer and affirmative defenses [23]. The parties then engaged in extensive discovery.

On December 22, 2016, St. Paul filed a motion for summary judgment [192]. On December 26, 2016, Renasant filed a motion for partial summary judgment [195]. Responses and replies have been filed to the two dispositive motions. The cross-motions for summary judgment are now ripe for review.

---

[1] In its motion to dismiss, St. Paul argued that Renasant failed to plead the date of discovery of its claim, an element required to sustain an employee dishonesty claim under a Financial Institution Bond. The Court found that Renasant's complaint sufficiently alleged that the subject losses were discovered within the Bond period by the following: (a) alleging that the Bond had an effective date of September 6, 2008; (b) attaching to its complaint a copy of the Bond providing by its clear terms that the Bond period is between September 6, 2008 and September 6, 2009; and (c) alleging that on July 24, 2009, Renasant provided timely notice to St. Paul concerning the potential losses.

## II. Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *See* Fed. R. Civ. P. 56(a); *Johnston & Johnston v. Conseco Life Ins. Co.*, 732 F.3d 555, 561 (5th Cir. 2013). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *See id.* at 323, 106 S. Ct. 2548. "An issue of fact is material only if its resolution could affect the outcome of the action." *DeBlanc v. St. Tammany Par. Sch. Bd.*, 640 F. App'x 308, 312 (5th Cir. 2016) (per curiam) (quoting *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 877 (5th Cir. 2003) (quoting *Wyatt v. Hunt Plywood Co.*, 297 F.3d 405, 408 (5th Cir. 2002) (internal quotation marks omitted))).

Under Rule 56(a), the burden then shifts to the nonmovant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Celotex Corp.*, 477 U.S. at 324, 106 S. Ct. 2548; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

It is axiomatic that in ruling on a motion for summary judgment "[t]he evidence of the nonmovant is to be believed[ ] and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, —— U.S. ——, ——, 134 S. Ct. 1861, 1863, 188 L. Ed. 2d 895 (2014) (per curiam) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal quotation marks omitted)); *see, e.g., Ard v. Rushing*, 597 F. App'x 213, 217 (5th Cir. 2014) (per curiam) (citing *United Fire & Cas. Co. v. Hixson Bros., Inc.*, 453 F.3d 283, 285 (5th Cir. 2006)). The Court " 'resolve[s] factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts.' " *See Thomas v. Baldwin*, 595 F. App'x 378, 378 (5th Cir. 2014) (per curiam) (quoting *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted)). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.' " *Id.* at 380 (quoting *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.' " *Cotton*, 134 S. Ct. at 1866 (quoting *Anderson*, 477 U.S. at 249, 106 S. Ct. 2505); *see Stewart v. Guzman*, 555 F. App'x 425, 430 (5th Cir. 2014) (per curiam) (citing *Vaughn v. Woodforest Bank*, 665 F.3d 632, 635 (5th Cir. 2011) (In ruling on a summary judgment motion, "[w]e neither engage in credibility determinations nor weigh the evidence.")). With the foregoing standard in mind, the Court turns to the motions before it.

### III.    *Analysis and Discussion*

St. Paul argues in its motion for summary judgment that all claims fail as a matter of law, because Renasant cannot prove improper financial benefit under the Bond. Renasant argues in

its motion for partial summary judgment that the Bond is a statutory bond under Mississippi law, Mississippi Code § 81-5-15, and that the Bond's terms improperly attempt to limit liability under Mississippi law. Because the ruling on Renasant's motion for partial summary judgment impacts St. Paul's motion for summary judgment, the Court first addresses Renasant's motion for partial summary judgment.

## A. **Renasant's Motion for Partial Summary Judgment**

Renasant argues in its motion for partial summary judgment that the Bond is a Mississippi statutory bond that must be construed pursuant to the terms of the statute, Mississippi Code § 81-5-15; that the Bond improperly attempts to limit St. Paul's liability on the Bond; that the statute requires that Financial Institution Bonds cover any acts of employee dishonesty; that this Court should hold that the Bond is a statutory bond under Mississippi law subject to the full coverage enumerated in the statute; and that the Court should "read out" any limiting terms and "read in" the more expansive terms of the statute. Renasant further argues that because the Bond is a statutory bond, Renasant is not required to prove that Hurt received a financial benefit of any kind, as the same is surplusage that must be stricken.

St. Paul argues in response that the Bond is not a statutory bond under Mississippi law, because the Bond was procured by Renasant Corporation for coverage to many entities, including Renasant Bank, and thus is not the fidelity bond contemplated by the statute; that the Bond was not procured by the employee/officer as contemplated by the statute; that Mississippi Code § 81-5-15 does not limit the terms of the Bond; that the Bond is entirely consistent with the objectives of the statute; that enforcing the requirements of Insuring Clause (A) of the Bond does not contravene Mississippi public policy; and that Renasant's argument that the statute imposes a "read-in-read-out" requirement has no valid legal support. St. Paul bases most of its arguments

on *BankInsure, Inc. v. Peoples Bank of the South*, 866 F. Supp. 2d 577 (S.D. Miss. 2012) (Lee, J.).

In *BankInsure, Inc.*, the district court was confronted with, *inter alia*, an issue of first impression under Mississippi law: whether a Financial Institution Bond issued by an insurer to a bank is a statutory bond under Mississippi Code § 81-5-15. In that case, as in the case *sub judice*, the bank argued that "[Section] 81-5-15 requires that a fidelity bond be issued for officers and employees of banks"; that a fidelity bond issued for such coverage is considered a statutory bond under the law; and that "since the statute requires that such fidelity bond provide coverage for 'any loss or liability' suffered as a result of the employee's acts of dishonesty, 'regardless of whether the instrument so describes the conditions or not,' " the bond's requirements of proof to sustain a claim for loan-related losses "conflict with the requirements of the statute and must be stricken as surplusage." *See BankInsure, Inc.*, 866 F. Supp. 2d at 581–82. In that case, similarly to the case *sub judice*, the insurer argued that the bond was not intended to be a statutory bond for the following reasons: (1) the statute requires the bank employee to furnish a fidelity bond, but the bond was procured by the bank, not the bank employee; (2) the statute requires the bank employee, as principal, to agree "to protect the [b]ank from losses with the surety's obligation being secondary to that of the employee," but "the [b]ond neither names [b]ank employees as principals nor treats them as such"; and (3) no evidence showed that "the [b]ank complied with the statutory provisions requiring approval by the State Comptroller and inspection by state authorities on examination of the [b]ank." *See id.* As in the case before this Court, in *BankInsure, Inc.*, the bank argued that bonds obtained under comparable statutes have been held to be statutory bonds. *See id.*

In its well-reasoned *BankInsure, Inc.* opinion, the court ultimately found it unnecessary to determine whether the subject bond was a statutory bond under Mississippi law, because "even assuming that is the case, the terms of the [b]ond may be enforced as written, as they are not inconsistent with the underlying purpose of [Mississippi Code] § 81-5-15." *See id.* at 582. The bond's specific proof requirements for loan-related losses were as follows: (1) the "claimed losses resulted directly from [the employee's] dishonest or fraudulent acts"; (2) the claimed losses "were committed by [the employee] with the manifest intent to cause the [b]ank to sustain such loss, or to obtain an improper financial benefit for himself or for another"; and (3) that "[the employee] was in collusion with one or more parties to the transactions and received an improper financial benefit in connection with the transactions." *Id.* at 583.

With all of the foregoing in mind, the Court turns to the issues before it.

> Since 1863, commercial banks in the United States have been able to choose to organize as national banks with a charter issued by the Office of the Comptroller of the Currency (OCC) or as state banks with a charter issued by a state government. The choice of charter determines which agency will supervise the bank: the primary supervisor of nationally chartered banks is the OCC, whereas state-chartered banks are supervised jointly by their state chartering authority and either the Federal Deposit Insurance Corporation (FDIC) or the Federal Reserve System (Federal Reserve).

Christine E. Blair & Rose M. Kushmeider, *Challenges to the Dual Banking System: The Funding of Bank Supervision*, FDIC BANKING REVIEW, Mar. 31 2006, https://www.fdic.gov/bank/analytical/banking/2006mar/article1 (last visited Feb. 17, 2017).[2]

---

[2] The Federal Deposit Insurance Act defines the term "State bank" as follows:

> any bank, banking association, trust company, savings bank, industrial bank (or similar depository institution which the Board of Directors finds to be operating substantially in the same manner as an industrial bank), or other banking institution which—
>
> > (A) is engaged in the business of receiving deposits, other than trust funds (as defined in this section); and

Renasant, a Mississippi-chartered bank, is a member of the FDIC. *See* Miss. Code Ann. § 81-5-9 (requiring Mississippi banks to be a member of the FDIC or other similar agency). Although not mentioned in the parties' briefing, the Court finds the FDIC's supervisory role important to the analysis of the statutory bond issue. When evaluating an application for FDIC coverage, the FDIC considers several factors, including "[t]he general character and fitness of the management of the depository institution." *See* 12 U.S.C. § 1816. The FDIC currently interprets this statutory factor to include "the sufficiency of fidelity insurance, policies, and audit coverage." *See* APPLYING FOR DEPOSIT INSURANCE, FDIC: A HANDBOOK FOR ORGANIZERS OF *DE NOVO* INSTITUTIONS, https://www.fdic.gov/regulations/applications/handbook.pdf (last visited Feb. 17, 2017). FDIC policy suggests that each FDIC-insured depository institution, including each state-chartered bank, "should maintain sufficient fidelity bond coverage on its active officers and employees to conform with generally accepted industry practices." *See* FDIC STATEMENT OF POLICY ON APPLICATIONS FOR DEPOSIT INSURANCE, https://www.fdic.gov/regulations/laws/rules/5000-3000.html (last visited Feb. 17, 2017).[3] Although the FDIC recommends that FDIC-insured depository institutions maintain fidelity

---

> (B) is incorporated under the laws of any State or which is operating under the Code of Law for the District of Columbia,
>
> including any cooperative bank or other unincorporated bank the deposits of which were insured by the Corporation on the day before August 9, 1989.

12 U.S.C. § 1813(a)(2).

[3] However, the Office of the Comptroller of the Currency (the OCC), an independent bureau of the United States Department of the Treasury that charters, regulates, and supervises national banks and federal savings associations, requires directors of <u>national banks</u> to ensure that all officers and employees have "adequate fidelity coverage." *See* 12 C.F.R. § 7.2013(a); About the OCC, https://www.occ.gov/about (last visited Feb. 17, 2017). "The [FDIC] may require any insured depository institution to provide protection and indemnity against burglary, defalcation, and other similar insurable losses," 12 U.S.C. § 1828(e), though nothing before this Court indicates that the FDIC required Renasant to obtain such coverage. *See FDIC v. AETNA Cas. & Surety Co.*, 903 F.2d 1073, 1078 (6th Cir. 1990); *Chambers Bank v. St. Paul Mercury Ins. Co.*, No. 4:11CV00389 BSM, 2011 WL 5529935, at *1 (E.D. Ark. Nov. 14, 2011).

coverage in policy, there is no federal banking law compelling such coverage. Furthermore, although the FDIC may condition approval of a federal deposit insurance application upon acquisition of adequate fidelity coverage, no proof before the Court indicates that the FDIC required Renasant to obtain fidelity bond coverage. Therefore, the only authority explicitly requiring the Bond was the Mississippi statute, Mississippi Code § 81-5-15.

Title 81 of the Mississippi Code concerns Banks and Financial Institutions and is comprised of several chapters, including Chapter 5, "General Provisions Relating to Banks and Banking."[4] Many of the Chapter 5 statutes were enacted during the Great Depression and have not been amended since that time.[5] The Mississippi Supreme Court observed in 1938 that the state banking laws were designed to strengthen the banking industry, which "is largely affected with a public interest" and "not exclusively a private business." *Moore v. Bank of Indianola Liquidating Corp.*, 184 So. 305, 307 (Miss. 1938). The statute at issue in this case, Mississippi Code § 81-5-15, was enacted on April 2, 1934 and last amended on March 25, 1936, and provides:

---

[4] The other current chapters of Title 81 of the Mississippi Code are as follows: Department of Banking and Consumer Finance (Ch. 1); Incorporation and Organization of Banks (Ch. 3); Branch Banks (Ch. 7); Regional Banking Institutions (Ch. 8); Insolvent Banks (Ch. 9); Savings Associations Law (Ch. 12); Credit Unions (Ch. 13); Savings Bank Law (Ch. 14); Mississippi Rural Credit Law (Ch. 15); Farmers' Credit Associations (Ch. 17); Mississippi S.A.F.E. Mortgage Act (Ch. 18); Consumer Loan Broker Act (Ch. 19); Insurance Premium Finance Companies (Ch. 21); Mississippi Debt Management Services Act (Ch. 22); Interstate Bank Branching (Ch. 23); The Mississippi International Banking Act (Ch. 25); Multistate, State, and Limited Liability Trust Institutions (Ch. 27); and Lender Trade Name and Trademark Use (Ch. 29).

[5] The following statutes were enacted on April 2, 1934 and have not been amended: Miss. Code Ann. §§ 81-5-3, Prohibited Uses of Bank Name; 81-5-5, Banks for Farm Loans; 81-5-11, Federal Reserve Bank Membership; 81-5-13, Federal Reserve Act Compliance/Effect; 81-5-17, Treatment of Bank's Stock; 81-5-19, Record of Stock Transactions; 81-5-49, Directorships in Multiple Banks; 81-5-53, Notice or Inquiry Concerning Authority; 81-5-59, Minors or Persons Under Disability; 81-5-65, Reporting of Depositors Presumed Dead; 81-5-67, Proving Adverse Claims; 81-5-71, Certification of Checks/Offense; 81-5-83, Limits on Indebtedness; 81-5-89, Drafts and Bills of Exchange; 81-5-94, Powers of Clearinghouse Associations; 81-5-101, Dissolving Solvent Corporations; and 81-5-103, Knowing or Willful Violations.

Along with the statute at issue in this case, Mississippi Code § 81-5-15, the following statutes were enacted on April 2, 1934 and last amended March 25, 1936: Mississippi Code §§ 81-5-21, Stock of Other Banks/Ownership; and 81-5-27, Stockholder Liability.

> Every active officer and employee of any bank or trust company in this state shall furnish a fidelity bond to the bank by which he is employed for the faithful performance of his duties, executed by some surety company authorized to do business in the State of Mississippi, as surety. The conditions of such bond, whether the instrument so describes the conditions or not, shall be that the principal shall protect the obligee against any loss or liability that the obligee may suffer or incur by reason of the acts of dishonesty of the principal or by reason of the violation of any of the provisions of the banking laws of Mississippi. The amount of such bond shall be fixed by the board of directors, subject, however, to approval of the state comptroller and the same shall be inspected upon the examination of the bank or trust company.
>
> Every banking corporation shall provide adequate insurance protection and indemnity against robbery and burglary and other similar insurable losses. Whenever any bank refuses or fails to comply with this requirement the state comptroller may contract for such protection and indemnity and add the cost thereof to the assessment otherwise payable by such bank for the support of the department of bank supervision.

Miss. Code Ann. § 81-5-15. Prior to the statute's enactment, banks commonly required each bank employee to execute a bond for the faithful performance of his duties. *See, e.g., Moore*, 184 So. at 306 (referring to a bank liquidating agent's requirement by Mississippi state banks to obtain surety bond in 1932); *McCarty v. Love*, 110 So. 795, 795 (Miss. 1927) (referring to cashier's requirement by employer bank to obtain surety bond). The statute codified this requirement.

Although the Mississippi statute expressly requires that "[e]very active officer and employee of any bank . . . furnish a fidelity bond to the bank," in common practice, banks have purchased bankers' blanket bonds to insure them in the event of wrongdoing by their employees. *See Fid. & Deposit Co. v. Merchants' & Marine Bank of Pascagoula*, 154 So. 260, 262 (Miss. 1934); *Webster v. U.S. Fid. & Guar. Co.*, 153 So. 159, 160 (Miss. 1934); *U.S. Fid. & Guar. Co. v. Citizens' State Bank of Moorhead*, 116 So. 605, 606 (Miss. 1928); *U.S. Fid. & Guar. Co. v.*

*Williams*, 49 So. 742, 742 (Miss. 1909). It is common practice today for each bank to purchase a Financial Institution Bond with liability and fidelity coverage;[6] the purpose of such bonds is to indemnify the bank against losses sustained through employee dishonesty and wrongful acts of third parties. *See* Hugh E. Reynolds, Jr. & James Dimos, *Fidelity Bonds and the Restatement*, 34 WM. & MARY L. REV. 1249, 1250 (1993) ("Many contracts with fidelity coverage are, in fact, insurance policies. These policies provide a variety of coverages to the insured of which the fidelity coverage is only a part.").

The Encyclopedia of Mississippi Law, a well-known and highly regarded treatise on Mississippi law, interprets the Mississippi statute as follows: "Every financial institution is required to maintain a fidelity bond executed by a surety company authorized to do business in Mississippi . . . Further, each institution is required to provide protection against robbery, burglary, and other similar insurable losses." *See* 1 JEFFREY JACKSON, MARY MILLER & DONALD CAMPBELL, ENCYCLOPEDIA OF MISSISSIPPI LAW § 10:74 (2016 ed.) (citing Miss. Code Ann. § 81-5-15); *see also Alcorn Bank & Trust Co. of Corinth, Miss. v. U.S. Fid. & Guar. Co.*, 705 F.2d 128, 130 (5th Cir. 1983) (citing Miss. Code § 81-5-15 as support for the statement that banks may purchase first-party insurance protection).

Aside from the Southern District of Mississippi decision in *BankInsure, Inc.*, no Mississippi district court has addressed the issue of whether a Financial Institution Bond issued to a Mississippi bank is a statutory bond under Mississippi law. Even in *BankInsure, Inc.*, as stated, the court declined to ultimately decide the issue, finding its resolution not necessary to a

---

[6] "Liability insurance protects against losses sustained by parties which, although within foreseeable expectation, are not predictable as to person, time, place or nature of occurrence or damage. Fidelity insurance undertakes to protect the assured against loss incurred by the assured or any predetermined specified group." *Everhart v. Drake Mgmt., Inc.*, 627 F.2d 686, 692 (5th Cir. 1980).

decision on the interpretation of the bond. Therefore, this Court has examined case law in all federal and state courts to shed light on the issue.

In particular, the Court found instructive *Kansas Bankers Surety Co. v. Farmers State Bank, Yale, IA*, 408 F. Supp. 2d 751 (S.D. Iowa 2005), wherein a surety company sued a bank it insured to obtain a declaratory judgment that coverage was not triggered on a Financial Institution Crime Bond. As in this case, in *Kansas Bankers Surety Co.*, the bank claimed that a bank officer caused certain bad loans to be made and a guaranty to be entered into that resulted in significant losses to the bank. *See id.* at 753–54. Also as in the instant case, the bank claimed the incidents triggered the fidelity coverage under the bond, and the bond required certain proof on loan-related losses. *See id.* at 753. The Southern District of Iowa held that the bond was a statutory bond under Iowa law. The Iowa statute at issue in that case provides in pertinent part that "[t]he officers and employees of a state bank . . . shall give a good and sufficient bond . . . indemnifying the state bank against losses, which may be incurred by reason of any act or acts of fraud, dishonesty, . . . or other unlawful act committed by such officer or employee directly or through connivance with others . . . ." Iowa Code § 524.705. The statutory language is somewhat similar to the analogous Mississippi statute, expressly requiring the officer/employee to obtain the bond to indemnify the bank for losses. In that case, the court held that the bond was a statutory bond governed by the Iowa statute, relying heavily on an earlier decision by the Eighth Circuit Court of Appeals, *First American State Bank v. Continental Insurance Co.*, 897 F.2d 319 (8th Cir. 1990), wherein that court had examined a bond with similar language and had concluded it was a statutory bond under Iowa law. *See id.* at 755.

In the case *sub judice*, the Bond presumably was approved with the state banking authorities and satisfies Renasant's obligation as a Mississippi bank to obtain liability coverage

and ensure that fidelity coverage is obtained on active employees/officers of the bank. These facts indicate that Renasant procured the Bond pursuant to the Mississippi statute. *See Hack v. Am. Sur. Co. of N.Y.*, 96 F.2d 939, 943 (7th Cir. 1938); *Kansas Bankers Sur. Co.*, 408 F. Supp. 2d at 756; *U.S. Fid. & Guar. Co. v. Poetker*, 102 N.E. 372, 375 (Ind. 1913). Furthermore, the Mississippi statute itself indicates an attempt to impact the fidelity bond and its interpretation by its terms "[t]he conditions of such bond, whether the instrument so describes the conditions or not, shall be that the principal shall protect the obligee against any loss or liability . . . ." *See* Miss. Code Ann. § 81-5-15. This provision furnishes significant protections and benefits for banks, in keeping with an apparent purpose of the Mississippi banking laws. If then, the bank takes it upon itself to procure a Financial Institution Bond including both fidelity and liability coverage, the bank is fulfilling its statutory duty with respect to liability coverage and fulfilling its employees'/officers' statutory duty with respect to fidelity coverage. But the bank is also contracting for itself and thus looking out for its own interests and protection. By obtaining the Bond, Renasant fulfilled the Mississippi law requiring liability and fidelity coverage for Mississippi banks, and in so doing, was fulfilling a purpose of the statute: to strengthen and protect itself. The Court finds that based on all of the foregoing, the Bond in the case *sub judice* is a statutory bond under Mississippi law.

The Fifth Circuit has stated:

> As a general rule, the liability of a surety on a bond which is plain and unambiguous is governed, like any other contract, by the intention of the parties as expressed in the instrument. However, in determining the legal effect of a statutory bond such as is here before the Court, certain rules of construction are to be considered. A statutory bond will be reviewed in the light of the statute creating the duty to give security. It will be generally held that the provisions of the statute and regulations will be read into the bond. *Maryland Cas. Co. v. United States*, 251 U.S. 342, 40 S. Ct. 155, 64 L. Ed. 297 (1919); *Whattoff v. United States*, 355 F.2d 473 (8th

> Cir. 1966); *Jones v. United States*, 189 F.2d 601 (8th Cir. 1951).
> So also, if a statutory bond contains provisions which do not
> comply with the requirements of law, they may be eliminated as
> surplusage and denied legal effect. *Fort Smith Structural Steel Co.
> v. W. Sur. Co.*, 247 F. Supp. 674 (W.D. Ark. 1965); 12 Am. Jur.
> 2d, Bonds § 26.

*Am. Cas. Co. of Reading, Pa. v. Irvin*, 426 F.2d 647, 650 (5th Cir. 1970).

In this case, the Bond's additional proof requirements for loan-related losses are consistent with the underlying purpose of the Mississippi statute. Although the statute does not expressly articulate the requirements stated in the Bond, the statute requires that the bank be indemnified for "any loss or liability that [it] may suffer or incur by reason of the acts of dishonesty of the [officer/employee] or by reason of the violation of any of the provisions of the banking laws of Mississippi." *See* Miss. Code Ann. § 81-5-15. The concept of "dishonesty" inherently incorporates an element of intent. The statute thus requires a bond providing protection against intentional misconduct. *See Kansas Bankers Sur. Co.*, 408 F. Supp. 2d at 756. It stands to reason that fidelity coverage could not extend to all "bad loans" merely benefiting the borrower. The "improper financial benefit" and "collusion" proof requirements are thus also logical requirements in keeping with the statutory language. *See First Dakota Nat'l Bank v. St. Paul Fire & Marine Ins. Co.*, 2 F.3d 801, 808 (8th Cir. 1993) (finding that though the bond at issue was a statutory bond under South Dakota law requiring bank officers/employees to furnish fidelity bonds to indemnify bank for losses sustained as a result of "any dishonest, fraudulent, or criminal act or omission committed or omitted by them," the bond's additional requirements of manifest intent and a monetary benefit were legally enforceable under statute); *BankInsure, Inc.*, 866 F. Supp. 2d at 583 (bond was consistent with purposes of Mississippi's statute requiring coverage of "any losses" in requiring proof that losses resulted directly from employee's dishonest or fraudulent acts, were committed by employee with the manifest intent either to

17

cause the bank to sustain such loss or to obtain an improper financial benefit or himself or another, and for loan-related loss that employee was in collusion with one or more parties to the transactions and received an improper financial benefit in connection with the transactions).

For all of the foregoing reasons, the Court will give full effect to the Bond. The Court now turns to St. Paul's motion for summary judgment.

## B. St. Paul's Motion for Summary Judgment

St. Paul argues in its motion for summary judgment that Renasant's claims fail as a matter of law, because Renasant cannot produce any evidence of an improper financial benefit or intent by Hurt to share in the proceeds of the Loans.

"As fidelity bonds, [F]inancial [I]nstitution [B]onds are in fact a form of insurance." 11 STEVEN PLITT ET AL., COUCH ON INSURANCE § 167:43 (3d ed. 2015). An insurance policy is a contract between the insurer and the insured, with the rights and duties set out by the provisions of the insurance policy; as such, an insurance policy is a contract subject to the general rules of contract interpretation. *ACS Constr. Co. of Miss. v. CGU*, 332 F.3d 885, 888 (5th Cir. 2003) (citing *Clark v. State Farm Mut. Auto. Ins. Co.*, 725 So. 2d 779, 781 (Miss. 1998)); *Haney v. Cont'l Cas. Co.*, No. 3:08cv482–DPJ–JCS, 2010 WL 235025, at *2 (S.D. Miss. Jan. 15, 2010) (citing *Sennett v. U.S. Fid. & Guar. Co.*, 757 So. 2d 206, 212 (Miss. 2000)); *Miss. Ins. Guar. Ass'n v. Blakeney*, 54 So. 3d 203, 205 (Miss. 2011). "Under Mississippi law, the construction of an insurance contract is limited to examining the policy." *Am. States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551, 555 (5th Cir. 1998) (citing *Emp'rs Mut. Cas. Co. v. Nosser*, 164 So. 2d 426, 430 (Miss. 1964)). "A policy must be considered as a whole, with all relevant clauses together." *U.S. Fid. & Guar. Co. v. Martin*, 998 So. 2d 956, 963 (Miss. 2008). " 'No rule of construction requires or permits [Mississippi courts] to make a contract differing from that made

by the parties themselves, or to enlarge an insurance company's obligations where the provisions of its policy are clear.' " *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 429 (5th Cir. 2007) (quoting *State Auto. Mut. Ins. Co. of Columbus v. Glover*, 176 So. 2d 256, 258 (Miss. 1965)). "The policy itself is the sole manifestation of the parties' intent, and no extrinsic evidence is permitted absent a finding by a court that the language is ambiguous and cannot be understood from a reading of the policy as a whole." *Am. States Ins. Co.*, 164 So. 2d at 555 (citing *Great N. Nekoosa Corp. v. Aetna Cas. & Sur. Co.*, 921 F. Supp. 401, 406 (N.D. Miss. 1996)).

"Ambiguity arises when a term or provision is susceptible to more than one reasonable meaning, but can also result from 'internal conflict' between policy provisions that renders uncertain the meaning of the policy as a whole." *Id.* (quoting *Miss. Farm Bureau Mut. Ins. Co. v. Walters*, 908 So. 2d 765, 769 (Miss. 2005)). Financial Institution Bonds "are often drafted by the joint efforts of associations represented by insurers and insureds." *Citibank Tex., N.A. v. Progressive Cas. Ins. Co.*, 522 F.3d 591, 595 n.12 (5th Cir. 2008). In that situation, "[t]he general rule that ambiguities in insurance contracts are to be construed strictly against the underwriter does not apply." *Id.*; *Sharp v. Fed. Sav. & Loan Ins. Corp.*, 858 F.2d 1042, 1046 (5th Cir. 1988); *Calcasieu-Marine Nat'l Bank v. Am. Employers' Ins. Co.*, 533 F.2d 290, 296 n.6 (5th Cir.), *cert. denied*, 429 U.S. 922, 97 S. Ct. 319, 50 L. Ed. 2d 289 (1976). However, in this case, the Bond is based on Standard Form No. 24 issued by the Surety & Fidelity Association of America (the "SFAA"), formerly known as the Surety Association of America. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 627 (5th Cir. 1998). The SFAA is comprised of member surety and insurance companies, including St. Paul, and has no bank members. *See* SFAA Member Companies and Foreign Affiliates, http://www.surety.org/MemberCompanies (last visited Feb. 17, 2017). Therefore, to the extent

19

any ambiguity exists in the Bond, the Court must interpret the Bond in favor of the insured, Renasant.

Renasant seeks coverage for losses related to the Loans under Insuring Clause A.1, Employee Dishonesty, which provides in pertinent part as follows:

> [St. Paul] . . . agrees to indemnify [Renasant] for:
>
> **(A) DISHONESTY OF EMPLOYEES**
>
> Loss resulting directly from:
>
> **Coverage A1 – Employee Dishonesty**
>
> Dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others, which acts are committed by the Employee with the intent:
>
> > (a) to cause [Renasant] to sustain such a loss; or
> >
> > (b) to obtain financial benefit for the Employee or another person or entity.
>
> If, however, some or all of [Renasant's] loss results directly or indirectly from Loans, that portion of the loss is not covered unless the Employee:
>
> > (i)   acted with the intent to cause the Insured to sustain such a loss;
> >
> > (ii)  was in collusion with one or more parties to the transaction; and
> >
> > (iii) has received, in connection therewith, an improper financial benefit.
>
> . . .
>
> Provided, however, that in the case of loss resulting from such Loans . . ., where such Employee fails to receive an improper financial benefit, such loss nevertheless will be covered hereunder as if the Employee had received such benefit if:

(i)     other persons with whom the Employee was dishonesty or fraudulently acting in collusion received proceeds from the Loan . . .; and

(ii)    [Renasant] establishes that the Employee intended to share or participate in the proceeds of the Loan . . . .

As used throughout Coverage A1 of this Insuring Clause, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing[,] or pensions.

Bond [1-1] at 9.

St. Paul argues in its motion for summary judgment, *inter alia*, that while Hurt was employed with Renasant, she was an exemplary employee who was never reprimanded on any basis, including in connection with the Loans; that Renasant looked to Hurt to resolve the ineffective personal guarantees on one of the Loans; that Hurt acquired new and larger guarantees from both Hyneman and Bourne; that even when no longer an employee of Renasant, Hurt testified on Renasant's behalf and provided key evidence necessary to support and enforce the guarantees; that Renasant can produce no evidence to support that Hurt received any improper financial benefit or that she colluded with Hyneman on Bourne; and that any commissions Hurt received on the Loans were in the normal course of employment and excluded from "improper financial benefit" by the terms of the Bond.

In its Proof of Loss dated May 19, 2011, Renasant stated: "[W]e have become aware of various[] gifts or accommodations bestowed upon Hurt by Hyneman during their lending relationship" and attaches "a copy of a check drawn on the account of B&B Holdings, LLC (a Bourne[-]controlled entity) on October 18, 2006, one day after the subject closing, documenting Bourne purchased $72,222.93 in assorted men's and lady's jewelry and watches. On the 'memo' line of the check is written 'Deal Gifts.' " Proof of Loss [1-2] at 19. Renasant stated at that time

that Hurt had not been asked whether she received any gifts from the principals on the Loans. Renasant also stated that Hurt "received $16,537 in compensation from Renasant over and above her normal salary" as "incentive compensation." *Id.* Subsequently, in correspondence dated July 6, 2011, Renasant supplemented its Proof of Loss with "a copy of records . . . obtained from Mednikow Jewelry identifying the items of jewelry purchased the day after closing as 'deal gifts' with the proceeds of Renasant Bank's loan, which includes three items of women's jewelry." *See* Supplemental Proof of Loss [1-3] at 1, 3–13.

However, in its response to St. Paul's motion for summary judgment, Renasant's sole argument is that Hurt received an improper financial benefit in the form of commissions on the allegedly fraudulently obtained Loans. In support of its argument, Renasant cites to and attaches its Rule 30(b)(6) deposition of its representative, Greg Hadaway, who testified that Hurt received a commission, bonus, or fee upon the closing of the Loans. *See* Renasant's R. 30(b)(6) Dep. [202-7] at 3.

When viewing the facts in the light most favorable to Renasant, the record falls short of a threshold showing that Hurt received an improper financial benefit. On summary judgment, Renasant provides no argument or evidence in support of its earlier position that Hurt received certain financial benefits from Hyneman in connection with the Loans, possibly including jewelry, vacations, and concert tickets. Hurt attested in her sworn affidavit that she did not receive any such benefits or "any other kind of favors, gifts, payoffs[,] or kickbacks in connection with the [Loans]." Hurt Aff. [193-11] ¶¶ 6–7. Further, in Hurt's deposition testimony, she denied receiving any such benefits. Hurt's Dep. [193-14] at 12–14. Renasant's proof that Hurt received any financial benefits in the form of jewelry, vacations, concert tickets failed to materialize. Accordingly, Renasant's arguments concerning any such benefits do not

exceed conjecture. Without evidence to support these allegations, the claims fail as a matter of law at the summary judgment stage.

Renasant's sole argument in response to St. Paul's motion for summary judgment is that Hurt's commissions in connection with the Loans were an improper financial benefit triggering Bond coverage. St. Paul argues that commissions cannot be an improper financial benefit because they are in the normal course of employment. Renasant argues that these commissions were obtained in the furtherance of fraudulent loans and thus were not in the normal course of employment.

The Court finds as follows. Although no Mississippi state-court case has interpreted the term "commissions" in a Financial Institution Bond, the Mississippi Court of Appeals has interpreted the term in the context of an insurance policy providing coverage for the dishonesty of employees. In *Watson Quality Ford, Inc. v. Great River Insurance Co.*, 909 So. 2d 1196 (Miss. Ct. App. 2005), a car dealership appealed summary judgment entered against it and in favor of its insurer. *Id.* at 1197–1198. The car dealership had submitted a claim for coverage under a policy providing, *inter alia*, coverage for acts of employee dishonesty. *Id* at 1198–2000. The insurer denied coverage, then filed a motion for a declaratory judgment that the claims were not covered by the policy. *Id.* at 1198. The policy included a definition of employee dishonesty that required certain proof, including that the employee "obtain[ed] financial benefit." *Id.* at 1200. However, as in the Bond in the case *sub judice*, the policy expressly excluded from its definition of financial benefit "employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing[,] or pensions." *See id.* In examining the proof, the Mississippi Court of Appeals found that the only financial benefit identified by the car dealership was commission presumably received by the

salesperson involved in the subject allegedly fraudulent transaction, and held that that did not trigger coverage under the employee dishonesty provision of the policy, because " 'commissions' are expressly excluded under the policy from being considered as a benefit"; therefore, summary judgment was appropriate on that issue. *Id.* at 1200–1201.

Similarly, in *Peoples Bank of the South v. BancInsure, Inc.*, 753 F. Supp. 2d 649 (S.D. Miss. 2010), the companion opinion to *BankInsure, Inc. v. Peoples Bank of the South*, 866 F. Supp. 2d 577, in applying Mississippi law to the construction of the Financial Institution Bond at issue in that case, the court held that the bank's allegations that employee received an improper financial benefit within the coverage of policy by being paid a fee to provide a correct title opinion, but producing a false title opinion, failed to trigger coverage because "[t]he bond unambiguously state[d] that 'financial benefit does not include any employee benefits earned in the normal course of employment, including salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions.' " *Id.* at 650–51, 659.

The only Fifth Circuit case interpreting similar insurance contract language is *Performance Autoplex II Ltd. v. Mid-Continent Casualty Co.*, 322 F.3d 847 (5th Cir. 2003) (applying Texas contract law). In that case, car dealership employers filed suit against the insurance company alleging it improperly refused to pay for employee dishonesty losses covered by one of its insurance policies. *Id.* at 850. The commercial insurance package on which the plaintiffs were insureds included a commercial crime coverage policy covering losses caused by employee dishonesty. *Id.* Pertinent to the case *sub judice*, one of the claims for loss was for an employee's embezzlement of car dealership funds by giving herself and another employee unauthorized pay increases, that is, pay increases that were never approved by the car dealership's general partner and general manager. *See id.* at 852. The insurer denied the claim,

claiming the loss did not result from "employee dishonesty," because the benefit was a salary increase. *Id.* The policy required proof that, *inter alia*, the employee "[o]btain[ed] financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing[,] or pensions." *Id.* The district court held that the "policy [did] not provide coverage for unauthorized pay increases due to employee dishonesty." *Id.* at 853, 857. The Fifth Circuit affirmed the district court, finding that under Texas law "[t]he plain language of the policy excludes unauthorized salaries obtained due to employee dishonesty" and that the employee's "unauthorized salary increases for herself and another employee" were "not covered by the plain language of the policy, which exempts salaries from the category of employee dishonesty losses." *Id.* at 857–58. The Fifth Circuit quoted with approval one court's statement that " 'unearned salaries and commissions are nevertheless still salaries and commissions and therefore belong to the generic category of employee benefits that are normally earned in the course of employment.' " *Id.* at 858 (quoting *Hartford Accident & Indem. Ins. Co. v. Wash. Nat'l Ins. Co.*, 638 F. Supp. 78, 84 (N.D. Ill. 1986)). The Fifth Circuit concluded that summary judgment was proper on the salary claim. *Id.* at 859.

The majority of courts have held in accord with these decisions that an employee's dishonest act is excluded from coverage when the employee receives a commission related to the loan, as alleged in the case *sub judice*. *See Mun. Secs., Inc. v. Ins. Co. of N. Am.*, 829 F.2d 7, 9–10 (6th Cir. 1987) (no coverage under policy that excluded commissions for a claim that employee obtained increased commissions by fraud); *F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 146 F. Supp. 2d 541, 546, 554 (D. N.J. 2001), *aff'd sub nom. F.D.I.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 57 F. App'x 965 (3d Cir. 2003) (per curiam)

("[C]ommissions are nothing more than fees earned in the normal course of employment and therefore were not covered under the bond."); *First Bank of Marietta v. Hartford Underwriters Mut. Ins. Co.*, 997 F. Supp. 934, 938 (S.D. Ohio 1998), *aff'd sub nom. Marietta v. Hartford Underwriters Ins. Co.*, 198 F.3d 245 (6th Cir. 1999) ("[a]s a threshold matter, [the bank] has produced no evidence which indicates that [the employee] would obtain any benefit from increasing a credit limit and making loans, beyond the commissions he would have earned in the normal course of business."); *James B. Lansing Sound, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 801 F.2d 1560, 1567 (9th Cir. 1986) (under California law, commissions on fraudulent sales were clearly excluded); *Auburn-Ford Lincoln Mercury v. Universal Underwriters Ins. Co.*, 967 F. Supp. 475, 478–79 (M.D. Ala. 1997) ("allegedly dishonestly obtained commissions" were not covered under policy); *Hartford Accident & Indem. Ins. Co.*, 638 F. Supp. at 83–84 ("[A]ll courts to speak on the matter have found the industry-wide definition of 'dishonest and fraudulent acts' to be unambiguous; that definition excludes recovery for losses resulting from an employee's intent to obtain a financial benefit for himself from commissions."); *First Philson Bank, N.A. v. Hartford Fire Ins. Co.*, 727 A.2d 584, 590 (Penn. 1999) (employee acts were excluded where employee obtained nothing but employee benefits, including stock, salary, and bonuses); *Benchmark Crafters, Inc. v. Nw. Nat'l Ins. Co.*, 363 N.W.2d 89, 91 (Minn. Ct. App. 1985) (employee acts were excluded where employee obtained nothing but "regular salary and expenses" from dishonest acts); *Mortell v. Ins. Co. of N. Am.*, 458 N.E.2d 922, 929–30 (Ill. App. 1983) (no coverage under policy where evidence showed that dishonest employee did not gain any benefit except commission).

A few courts have held that certain employee benefits obtained due to employee dishonesty were covered losses under similar policy language. However, that is clearly the

26

minority rule. *See F.D.I.C. v. St. Paul Fire & Marine Ins. Co.*, 738 F. Supp. 1146, 1160 (M.D. Tenn. 1990), *modified on other grounds*, 942 F.2d 1032 (6th Cir. 1991) (coverage triggered with employee's unauthorized payments to himself); *Cincinnati Ins. Co v. Tuscaloosa Cty. Parking & Transit Auth.*, 827 So. 2d 765, 767–68 (Ala. 2002) (coverage triggered with unauthorized salaries obtained during employee dishonesty; drawing distinction that "salaries" means only "authorized salaries" and such salaries were "stolen" not "earned"); *Klyn v. Travelers Indem. Co.*, 273 A.D.2d 931, (N.Y. App. Div. 2000) (coverage triggered when insured's comptroller paid himself excessive salary and bonuses).

Applying the majority rule, which was applied by the United States District Court for the Southern District of Mississippi, the Mississippi Court of Appeals, and the Fifth Circuit Court of Appeals (in a matter of Texas law), because Renasant's sole argument in response to St. Paul's motion for summary judgment on the "improper financial benefit" issue is that Hurt wrongfully obtained commissions in connection with the Loans, summary judgment is proper, because "commissions" are excluded from "improper financial benefit" under the Bond coverage.

Even assuming the commissions Hurt received could somehow be considered not within the normal course of employment, and thus were not excluded from Bond coverage, Renasant has not shown that Hurt furthered fraudulent loans. First, it is undisputed that Hurt did not have the authority to disburse loan funds, but rather turned the Loans over to the bank committee for approval and that the bank committee approved the Loans—notwithstanding that they may have been under collateralized or rife with other problems. Second, there is no proof that Hurt concealed any information concerning the Loans from Renasant. Renasant has alleged facts supporting its case, but has presented little to no evidence on any of its allegations of improper financial benefit. This is insufficient to take the case to trial.

In sum, because the record fails to raise a genuine dispute of fact concerning any "improper financial benefit," the claims must be dismissed as a matter of law.

### IV.    Conclusion

For all of the foregoing reasons, the Court finds that Plaintiff Renasant Bank's motion for partial summary judgment [195] shall be GRANTED IN PART AND DENIED IN PART, specifically, granted insofar as the Financial Institution Bond at issue is a statutory bond under Mississippi Code § 81-5-15, but denied insofar as that in any way alters the terms of the Bond. The Court finds that the terms of the Financial Institution Bond should be interpreted as written.

The Court further finds that no genuine dispute of material fact exists as to the "improper financial benefit" proof requirement.    Accordingly, the Court finds that Defendant St. Paul Mercury Insurance Company's motion for summary judgment [192] shall be GRANTED in all respects and that all claims must be DISMISSED AS A MATTER OF LAW.

Finally, the Court finds that the following motions should be denied as moot: Plaintiff Renasant Bank's motion to strike [211] specific argument in Defendant St. Paul Mercury Insurance Company's reply [207] in support of its motion for summary judgment [192]; Defendant St. Paul Mercury Insurance Company's motion *in limine* concerning expert testimony [199]; and Plaintiff Renasant Bank's motion for reconsideration [215] of the Magistrate Judge's Order [206] denying motion to compel [186].  This case is CLOSED.

An order in accordance with this opinion shall issue this day.

THIS, the 21st day of February, 2017.

_____
SENIOR U.S. DISTRICT JUDGE